UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
JOHN LANTZ, Individually and on Behalf of  :   Civil Action No.
All Others Similarly Situated,             :
                                    :   <u>CLASS ACTION</u>
                Plaintiff,   :
                                      :   COMPLAINT FOR VIOLATIONS OF THE
    vs.                       :   FEDERAL SECURITIES LAWS
                                      :
CBS CORPORATION, LESLIE MOONVES,  :
JOSEPH R. IANNIELLO, LAWRENCE    :
LIDING, DAVID RHODES, DAVID R.     :
ANDELMAN, JOSEPH A. CALIFANO, JR.,  :
WILLIAM S. COHEN, GARY L.         :
COUNTRYMAN, CHARLES K. GIFFORD,  :
LEONARD GOLDBERG, BRUCE S.     :
GORDON, LINDA M. GRIEGO, ROBERT N. :
KLIEGER, ARNOLD KOPELSON,      :
MARTHA L. MINOW, DOUG MORRIS and  :
SHARI REDSTONE,             :
                                      :
               Defendants.  :
———————————————————— x  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff John Lantz alleges the following based upon personal knowledge as to himself and his own acts, and upon an investigation conducted by and through his attorneys, which included a review of Securities and Exchange Commission ("SEC") filings by CBS Corporation ("CBS" or the "Company"), press releases, conference calls, defendants' public statements, media reports, analyst reports, and information available via the internet.  Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of CBS Class A and Class B common stock between November 3, 2017 and July 27, 2018, inclusive (the "Class Period") against CBS, certain of its senior executives, and certain current and former members of its Board of Directors (the "Board") asserting violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Defendant CBS is a mass media company with operations in entertainment, cable networks, publishing, and local media.  The Company operates businesses that span the media and entertainment industries, including the CBS Television Network, cable networks, content production and distribution, television stations, internet-based businesses, and consumer publishing.

3.     Throughout the Class Period, CBS regularly acknowledged that the "Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees" and that it "believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company."  In addition, CBS claimed to maintain "standards for ethical conduct that are expected of all directors and employees of the Company."  Such standards, as outlined in CBS's Business Conduct Statement, included:

CBS has a "zero tolerance" policy for sexual harassment or harassment . . . . Discriminatory treatment, including sexual harassment and harassment based on a person's race, age or other protected status, is strictly prohibited. CBS will take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware.

4.      As alleged herein, defendants made materially false and misleading statements and/or failed to disclose the following material information during the Class Period:

- CBS executives, including CBS's Chief Executive Officer ("CEO") defendant Leslie Moonves ("Moonves"), had engaged in widespread workplace sexual harassment at CBS;

- CBS's enforcement of its own purported policies was inadequate to prevent the foregoing conduct;

- This conduct would subject CBS to heightened legal liability and impede the ability of key CBS personnel to execute the Company's business strategy; and

- Defendants' public statements during the Class Period were materially false and misleading and/or lacked a reasonable basis.

5.      In October of 2017, the #MeToo movement began as an umbrella of solidarity on Twitter, helping to empower countless women to share their experiences of surviving sexual harassment or assault. The #MeToo movement quickly gained momentum online with the help of various celebrities, and within a matter of days an avalanche of accusations swept through the entertainment industry.

6.      The #MeToo movement's impact on the entertainment industry crystalized on October 10, 2017, when *The New Yorker*'s investigative reporter Ronan Farrow ("Farrow") published an explosive exposé detailing decades' worth of sexual abuse allegations by numerous women at the hands of former media mogul Harvey Weinstein. The Pulitzer Prize-winning article described how Weinstein lured women – often young actresses – into hotel bars and rooms to harass or assault them. After the allegations came to light, Weinstein was swiftly ousted from The Weinstein Company and charged with rape and other offenses in New York City.

- 2 -

7.     Over the ensuing months, the #MeToo movement was credited with ending the careers of several other celebrities, politicians, businessmen, and media executives, including former U.S. Senator Al Franken, actor Kevin Spacey, Chairman and CEO of Wynn Resorts Steve Wynn, and Chairman and CEO of Fox News Roger Ailes.

8.     CBS was not spared from #MeToo revelations.  In November 2017, CBS was forced to fire its lauded news anchor Charlie Rose after *The Washington Post* published an article in which multiple women accused him of sexual misconduct.  Three of the women who accused Rose have since sued him and the Company.

9.     Recognizing the #MeToo movement's power, as well as its potential threat, defendant Moonves quickly moved to publicly align himself with its cause.  On November 29, 2017, defendant Moonves told an audience at *Variety*'s Innovate Summit that the #MeToo movement was "'a watershed moment'" and that "'I think it's important that a company's culture will not allow for this. And that's the thing that's far-reaching.  There's a lot we're learning.  There's a lot we didn't know.'"  Defendant Moonves continued his posturing as an ally of the #MeToo movement when, in December 2017, he helped found the Commission on Eliminating Sexual Harassment and Advancing Equality in the Workplace.

10.     Despite defendant Moonves's embrace of the #MeToo movement and CBS's purported commitment to combat sexual harassment, media outlets began reporting on July 27, 2018 that Farrow would be publishing an article in *The New Yorker* detailing allegations by six women of a disturbing pattern of sexual harassment by defendant Moonves and describing a culture of rampant sexual harassment at CBS.

11.     Indeed, after the Weinstein exposé, Farrow began an extensive investigation into decades of alleged sexual harassment by defendant Moonves and the environment engendered by

Moonves that reportedly facilitated ongoing sexual harassment at CBS.  As Farrow acknowledged during a July 29, 2018 interview with CNN's Brian Stelter, sources about defendant Moonves and the hostile culture at CBS "began coming to [him] immediately after the Harvey Weinstein story" was published in late 2017.  As later reported by *The New York Times* on July 31, 2018, "CBS's board knew – or should have known – about potential problems" with defendant Moonves soon after Farrow's first exposé broke in October 2017, as "[r]umors had proliferated almost immediately after *The New York Times* and *The New Yorker* published their prizewinning exposés . . . in October"; those rumors only intensified in November 2017 after Charlie Rose was fired from CBS; and "[b]y December [2017], CBS executives had been told that reporters for The Times and The Wall Street Journal were asking around about sexual-harassment allegations involving Mr. Moonves."  And, as the *Los Angeles Times* reported on August 2, 2018, "CBS board members were aware late last year that multiple news organizations were looking into Moonves' conduct in the wake of the Harvey Weinstein scandal, which exploded in October."  According to the *Los Angeles Times*, as "[w]omen came forward with their stories of past abuse, and reporters at multiple outlets began chasing tips about various Hollywood figures," "CBS learned of such reporting efforts after journalists reached out to female executives and asked about their experiences with Moonves . . . ."

12.     Meanwhile, defendants CBS and Moonves knew there was plenty for Farrow to discover, despite the vintage of some of the alleged misconduct.  For instance, in November 2017, a woman filed a criminal complaint with the Los Angeles Police Department ("LAPD") claiming defendant Moonves had forced her to perform oral sex on him in the 1980s.  As the *Los Angeles Times* reported on August 2, 2018, the LAPD "investigation began in November after an 81-year-old woman told detectives that Moonves sexually assaulted her three decades ago when they both worked at then-television powerhouse Lorimar Productions, the studio behind such shows as

'Dallas' and 'Knots Landing,'" with the woman claiming that defendant Moonves, "during a 1986 meeting in his office, demanded oral copulation."  She also reportedly "told police about another incident, in 1988, when he allegedly exposed himself and assaulted her."  As recent *The New York Times* and *The Wall Street Journal* articles have now confirmed, defendant Moonves knew about this sexual harassment allegation and criminal investigation as early as November 2017, while several CBS Board members, including Shari Redstone ("Redstone") (president of CBS's controlling shareholder, National Amusements, Inc.), knew by January 2018 – months before these facts were revealed to investors.  Despite the fact that defendants CBS, Moonves, and Redstone, as well as several other Board members, knew of these serious allegations and the increasing threat to Moonves's tenure at CBS in November 2017 and January 2018, the Company's risk disclosures remained the same, leaving investors completely unaware of the looming leadership crisis at CBS until late July 2018.

13.     As *The Wall Street Journal* would later disclose on September 10, 2018, under defendant Moonves's tenure, CBS had a hostile work environment for female employees for years:

> Mr. Moonves had romantic relationships with multiple senior and junior CBS staffers over the years, that, while consensual, made other executives uncomfortable and led some women to feel the company had a misogynistic culture, former executives say.

> Several female former executives say women at CBS were given a hard time for getting pregnant, expected to take notes at meetings and excluded from other key meetings by their male peers and bosses.  When they went to human resources to complain, the women said, they were ignored.

> "You knew that if you complained, you wouldn't win, and you potentially get voted off the island and then never work in the town again," said one female former CBS executive.

14.     On July 27, 2018, media outlets began reporting that *The New Yorker* would shortly publish an article describing a pattern of sexual harassment alleged by six women against defendant Moonves.  The article would also outline allegations of sexual harassment against several CBS News

- 5 -

executives, including Jeffrey Fager, the long-time head of *60 Minutes*.  On this news, CBS's stock price fell over 6% on unusually heavy volume.

15.     On August 6, 2018, *The New Yorker* published the online exposé by Farrow detailing allegations of years of sexual assault against defendant Moonves by his co-workers at CBS and describing how, under his leadership, CBS had facilitated the sexual harassment of scores more women, including company-sanctioned retaliation against victims who spoke up.  In the exposé, Farrow stated that "[s]ix women who had professional dealings with [Moonves] told me that, between the nineteen-eighties and the late aughts, Moonves sexually harassed them," with "[f]our describ[ing] forcible touching or kissing during business meetings, in what they said appeared to be a practiced routine," and "[t]wo [telling] me that Moonves physically intimidated them or threatened to derail their careers."

16.     Subsequently, on September 9, 2018, *The New Yorker*'s published a second exposé by Farrow outlining, in even more harrowing detail than the first article, additional sexual harassment and assault allegations against defendant Moonves and further describing CBS's widespread culture of sexual harassment.  Within hours of the story's publication, CBS announced that defendant Moonves would be stepping down as the Company's Chairman and CEO, causing CBS's stock price to decline further.

17.     Three days later, on September 12, 2018, CBS ousted *60 Minutes* head Jeffrey Fager for sending a threatening text message to a CBS reporter investigating allegations that he had fostered a culture of harassment at the Company.  Later that day, a *New York Times* article revealed that defendant Moonves had actively concealed the LAPD's November 2017 criminal sexual assault investigation.  Even worse, the article revealed that, at the time that one of Moonves's accusers was

threatening to go public, Moonves was actively trying to find the woman a job at CBS to ensure her silence.

18.     On September 28, 2018, CBS disclosed that it had "received subpoenas from the New York County District Attorney's Office and the New York City Commission on Human Rights" regarding "the allegations in recent press reports about CBS's former Chairman and Chief Executive Officer, CBS News and cultural issues at all levels of CBS," and that the "New York State Attorney General's Office ha[d] also requested information about these matters."

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa), as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §78j(b) and §78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5).

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act, because CBS is headquartered at 51 West 52nd Street, New York, New York, certain defendants reside in this District, and defendants' wrongful acts occurred in this District.

21.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

22.     Plaintiff John Lantz acquired CBS common stock during the Class Period, as set forth in the accompanying Certification, which is incorporated herein by reference, and suffered damage as a result.

- 7 -

23.     Defendant CBS Corporation has two classes of publicly traded common stock listed and widely traded on the New York Stock Exchange ("NYSE"), an efficient market: voting Class A common stock (entitled to one vote per share), which trades under the ticker CBS-A; and non-voting Class B common stock, which trades under the ticker CBS.  As of August 2, 2018, CBS had more than 37.5 million shares of Class A common stock and approximately 338.5 million shares of Class B common stock issued and outstanding.  In 2000, CBS was acquired by Viacom Inc. in a deal that made Viacom the second largest entertainment company in the world.  In 2005, Viacom split into two separately operated but commonly controlled entities, CBS and Viacom.  National Amusements, Inc. ("NAI") was then and remains the controlling stockholder of both CBS and Viacom.  Sumner Redstone, NAI's controlling stockholder, chairman of the board and CEO, is the Chairman Emeritus of CBS and the Chairman Emeritus of Viacom.  Defendant Shari Redstone ("Redstone"), Sumner Redstone's daughter, is the President and a director of NAI and the Vice Chair of the Board of Directors of CBS and Viacom.  Defendant David R. Andelman was a director of CBS until September 9, 2018, and also served as a director of NAI.  As of March 31, 2018, NAI directly or indirectly owned approximately 79.7% of CBS Class A common stock and approximately 10.3% of Class A common stock and non-voting Class B common stock on a combined basis.

24.     Defendant Leslie Moonves ("Moonves") was, at all relevant times, CBS's President, CEO and the Chairman of its Board.  As CEO and Chairman, defendant Moonves regularly spoke on CBS's behalf in releases, conference calls, and SEC filings.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Moonves certified the Company's Forms 10-Q filed with the SEC on November 6, 2017, May 4, 2018 and August 2, 2018, and the Form 10-K filed with the SEC on February 20, 2018.

25.     Defendant Joseph R. Ianniello ("Ianniello") was, at all relevant times, CBS's Chief Operating Officer.  As COO, defendant Ianniello regularly spoke on CBS's behalf in releases, conference calls, and SEC filings.  Defendant Ianniello signed the Company's Forms 10-Q filed with the SEC on November 6, 2017, May 4, 2018 and August 2, 2018, and the Form 10-K filed with the SEC on February 20, 2018.

26.     Defendant Lawrence Liding ("Liding") was, at all relevant times, CBS's Executive Vice President, Controller and Chief Accounting Officer.  In this capacity, defendant Liding regularly spoke on CBS's behalf in releases, conference calls, and SEC filings.  Defendant Liding signed the Company's Forms 10-Q filed with the SEC on November 6, 2017, May 4, 2018 and August 2, 2018, and the Form 10-K filed with the SEC on February 20, 2018.

27.     Defendant David Rhodes ("Rhodes") is and was, at all relevant times, the President of CBS News.  In this role, defendant Rhodes regularly spoke on CBS's behalf.

28.     Defendants David R. Andelman, Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Robert N. Klieger, Arnold Kopelson, Martha L. Minow, Doug Morris, and Shari Redstone are, or were at relevant times, members of the CBS Board (sometimes collectively referred to as the "Director Defendants").  As CBS directors, these defendants made decisions on CBS's behalf during the Class Period and signed the Company's Form 10-K filed with the SEC on February 20, 2018.

29.     The defendants named in ¶¶24-28 are sometimes referred to herein as the "Individual Defendants."  CBS and the Individual Defendants are collectively referred to herein as "defendants."

30.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of CBS, were in possession of confidential, proprietary information concerning the Company and its operations.  By reason of their positions within the Company, the Individual

Defendants obtained, had access to and/or were in possession of material adverse nonpublic information concerning CBS via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via reports, presentations and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31.     As senior executive officers and controlling persons of a publicly traded company whose common stock was and is registered with the SEC pursuant to the 1934 Act, and was and is traded on NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding CBS's operations and business, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CBS common stock would be based upon truthful and accurate information. Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## SEC DISCLOSURE REQUIREMENTS

32.     The SEC has specific rules governing the content of disclosures made by public companies like CBS in their filings with the SEC.  Specifically, SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain a section called "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

33.     Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

- "Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations."

- "Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

34.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

## BACKGROUND

35.     In July 2016, former Fox News host Gretchen Carlson filed suit against Roger Ailes, who had led Fox News for two decades.  Once her claims were corroborated by Megyn Kelly, one of the network's biggest stars, Roger Ailes was forced to resign from Fox News.  In September 2016, Fox News' parent corporation, 21st Century Fox, paid more than $1 million to Laurie Dhue, an anchor from 2000 to 2008, to settle harassment claims against network mainstay Bill O'Reilly and his boss Roger Ailes.  Several other former Fox News hosts, including Andrea Tantaros and Juliet Huddy, also alleged sexual harassment (and retaliation, in Tantaros's case) against Roger Ailes and Bill O'Reilly.  Ms. Carlson's case was subsequently settled for $20 million.  Thereafter, the U.S. Department of Justice began a formal investigation into whether 21st Century Fox had concealed past sexual harassment settlements from investors, and various *New York Times* investigative

exposés revealed that Bill O'Reilly had paid half a dozen women nearly $50 million to settle various sexual harassment lawsuits, leading to O'Reilly's termination.  Like defendant Moonves was to CBS, Roger Ailes and Bill O'Reilly were crucial to Fox News' brand and value.

36.     Beginning in October 2017, investigative reporter and lawyer Ronan Farrow sparked what is now referred to as the #MeToo movement by publishing a Pulitzer Prize-winning investigative exposé in *The New Yorker* detailing multiple allegations of sexual abuse by media mogul Harvey Weinstein, which resulted in Weinstein being expelled from his own company.  Over the ensuing months (and continuing until today), the #MeToo movement was responsible for ending the careers of a host of businessmen, news anchors, celebrities, and politicians, as well as the filing of numerous legal complaints and charges, as a result of sexual harassment allegations, including the head of Amazon Studios (Roy Price), an Olympic team doctor (Lawrence G. Nassar), a well-known actor (Kevin Spacey), a candidate for the U.S. Senate (Roy Moore), a Today show co-host (Matt Lauer), a Minnesota Public Radio host (Garrison Keillor), a record label founder (Russell Simmons), a U.S. Senator (Al Franken), a celebrity chef (Mario Batali), and an opera conductor at the N.Y. Metropolitan Opera (James Levine).  Farrow also published an online exposé detailing abuse accusations against former New York Attorney General Eric Schneiderman that resulted in Schneiderman resigning three hours later and the exposé never appearing in print.  Farrow's reporting has largely been credited with significantly advancing, if not starting, the #MeToo movement.

37.     CBS was not spared by the #MeToo movement, as several senior executives and key on-air talent at CBS were about to have #MeToo moments of their own.

## MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

38.     On November 3, 2017, CBS filed a prospectus as part of a shelf registration statement filed on Form S-3 with the SEC, which incorporated by reference CBS's Form 10-K for the year ended December 31, 2016 and the quarterly report on Form 10-Q for the quarterly period ended March 31, 2017.  The Individual Defendants (except defendant Rhodes) signed or authorized the signing of the shelf registration statement.

(a)     The Form 10-K for the fiscal year ended December 31, 2016 (filed with the SEC on February 17, 2017) had a risk factor stating:

> The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities.  The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

(b)     The Form 10-Q for the period ended March 31, 2017 (filed with the SEC on May 4, 2017) incorporated the above-quoted risk factor included in the Form 10-K for the fiscal year ended December 31, 2016 without any edits.

39.     On November 6, 2017, CBS filed a quarterly report on Form 10-Q for the period ended September 30, 2017 with the SEC ("3Q17 10-Q"), which was certified pursuant to Sarbanes-Oxley by defendants Moonves and Ianniello, and signed by defendants Ianniello and Liding.  The 3Q17 10-Q did not identify any specific risk factors, other than to state the following:

> These risks, uncertainties and other factors include, among others: . . . other factors described in the Company's filings made under the securities laws, including, among others, those set forth under "Item 1A. Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2016 and in our Quarterly Reports on Form 10-Q, and in the Company's recent Current Reports on Form 8-K.  There may be additional risks, uncertainties and factors that the Company does not currently view as material or that are not necessarily known.

- 13 -

40.     The risk factor incorporated by reference into the Form S-3 and left unchanged in the 3Q17 10-Q was materially false and misleading when made because it omitted the fact that, as reported by *The New York Times* on July 31, 2018, "CBS's board knew – or should have known – about potential problems with Mr. Moonves's past behavior long before the news broke last week. Rumors had proliferated almost immediately after *The New York Times* and *The New Yorker* published their prizewinning exposés of the Hollywood producer Harvey Weinstein in October." Specifically, in the fall of 2017, a woman filed a criminal complaint with the LAPD claiming Moonves had forced her to perform oral sex on him in the 1980s, which *The New York Times* reported Moonves had "known about since November." Moonves did not disclose this investigation to members of CBS's nomination and governance committee until January 2018, and investors did not learn about the complaint, investigation, or Mr. Moonves's knowledge thereof, until a series of articles in *The New Yorker*, *The Wall Street Journal* and *The New York Times* was published beginning in July 2018 through September 2018. As a result, not only was the risk factor materially false and misleading, but defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus §10(b) of the 1934 Act, by failing to disclose that: (i) the Company's business operations were facing substantial risk, as CBS was being drawn further into conflict with the #MeToo movement as a result of the ongoing investigations into prior allegations of misconduct by defendant Moonves; and (ii) having CBS drawn further into conflict with the #MeToo movement subjected it to numerous undisclosed risks, including monetary and reputational risks, particularly because Moonves was a key CBS executive and advertising was one of CBS's largest revenue sources, and the loss of Moonves and/or any harm to CBS's reputation could adversely affect CBS's business, including its future revenue and growth prospects.

41.     On November 16, 2017, CBS and CBS Operations Inc., a wholly owned subsidiary of the Company, issued and sold $900 million aggregate principal amount of senior notes in a private placement pursuant to Rule 144A under the Securities Act of 1933 pursuant to the November 3, 2017 Form S-3, comprising: (a) $400 million aggregate principal amount of 2.900% senior notes due 2023; and (b) $500 million aggregate principal amount of 3.700% senior notes due 2028.

42.     On November 20, 2017, *The Washington Post* reported that eight women had told it that "longtime television host Charlie Rose made unwanted sexual advances toward them, including lewd phone calls, walking around naked in their presence, or groping their breasts, buttocks or genital areas."  The article further reported that the "women were employees or aspired to work for Rose at the 'Charlie Rose' show from the late 1990s to as recently as 2011."  Within hours of the publication of the article, PBS and Bloomberg LP immediately suspended distribution of the "Charlie Rose" show and CBS announced that it was suspending Rose as it looked into the matter.

43.     The next day, November 21, 2017, CBS fired Charlie Rose.  Thereafter, PBS canceled distribution of his self-titled nightly interview program.  As *The New York Times* reported:

> David Rhodes, the president of CBS News, told staff members in an internal email that Mr. Rose, a host of "CBS This Morning" and a "60 Minutes" correspondent, had been let go after allegations were raised "of extremely disturbing and intolerable behavior said to have revolved around his PBS program."

44.     On November 29, 2017, defendant Moonves presented for CBS at the *Variety* Innovate Summit.  Asked about the #MeToo movement and its potential impact on CBS, defendant Moonves stated in pertinent part that: "'It's a watershed moment . . . I think it's important that a company's culture will not allow for this.  And that's the thing that's far-reaching.  There's a lot we're learning.  There's a lot we didn't know.'"  In the wake of the Charlie Rose firing, and with full knowledge of the LAPD's criminal investigation into his own alleged sexual misconduct, defendant Moonves's statements were particularly false and misleading as they omitted the substantial risk

posed to CBS's business from the ongoing investigations into prior allegations of misconduct against him.

45.     On February 1, 2018, CBS issued a press release announcing that its Board had "established a special committee of independent directors to evaluate a potential combination with Viacom Inc."  As subsequent articles have confirmed, CBS and Moonves did so while concealing that CBS's business – including any potential negotiation or combination with Viacom – was then at substantial risk as a result of the ongoing investigations into prior allegations of misconduct against defendant Moonves.  Specifically, *The Wall Street Journal* reported on September 10, 2018 that certain members of the CBS Board openly discussed in January 2018 that rumors were then circulating that CBS and defendant Moonves could soon be drawn into conflict with the #MeToo movement due to the ongoing investigations of his prior alleged misconduct, including the LAPD's criminal investigation into sexual assault allegations against him by a former employee.  Citing confidential sources, *The Wall Street Journal* detailed how defendant Redstone had telephoned defendant Moonves and certain fellow directors "to ask about rumors that the company's chief executive, Leslie Moonves, was about to have a #MeToo moment."  According to the article, "[a]round the same time, Mr. Moonves informed some directors, but not the full board, that a sexual assault complaint had been filed against him in the Los Angeles Police Department, stemming from an alleged incident in the 1980s."  Defendant Moonves reportedly "disclosed the existence of this complaint, which was dismissed for having passed the statute of limitations, to members of CBS's nomination and governance committee in January."  Meanwhile, defendant Redstone "had already gone to two CBS directors, Martha Minow and Bruce Gordon, urging them to investigate Mr. Moonves's past."

46.     On February 15, 2018, CBS issued a press release announcing its financial results for the 2017 fourth quarter and fiscal year ("4Q17" and "FY17"), ended December 31, 2017.  The release quoted defendant Moonves: "'I'm very pleased to report that CBS turned in outstanding fourth-quarter results, including double-digit revenue growth and our 32nd consecutive quarter of EPS growth, capping off a very strong year in 2017.'"  CBS and defendant Moonves failed to disclose that the Company's strong business metrics and financial prospects were facing substantial risk as a result of the ongoing investigations into prior allegations of misconduct against defendant Moonves.  Instead, the release stated in pertinent part as follows:

> "I'm very pleased to report that CBS turned in outstanding fourth-quarter results, including double-digit revenue growth and our 32nd consecutive quarter of EPS growth, capping off a very strong year in 2017. . . .  The CBS Corporation produces many of the most-valuable programming franchises in the world, reaching more viewers than anyone else.  This gives us a tremendous advantage as streaming becomes more central to our distribution strategy.  As a result, we now have nearly five million subscribers at *CBS All Access* and Showtime OTT combined.  When you add this to our retrans and skinny bundle subscribers, our total subscriber base continues to grow at an accelerated pace.  With the backdrop of this changing business model, and the completed separation of our radio business during the fourth quarter, we now have even greater visibility into our operations.  Specifically, we expect 2018 to be another strong year for the CBS Corporation, with revenue growth in the high-single digits and EPS growth in the high teens from the record $4.40 we're reporting to you today.  So we feel very good about the growth path before us, and we continue to have great confidence in our ability to deliver for our shareholders."

47.     On February 20, 2018, CBS filed its Form 10-K for the year ended December 31, 2017 with the SEC ("2017 Form 10-K"), which was signed by defendants Moonves, Ianniello, and Liding, and the Director Defendants (by Lawrence P. Tu as Attorney-in-Fact for Directors), and certified pursuant to Sarbanes-Oxley by defendants Moonves and Ianniello.  The 2017 Form 10-K repeated, verbatim, the same risk factor included in the 2016 Form 10-K filed on February 17, 2017:

> The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that

the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

48.     The 2017 Form 10-K also contained two sections titled "Item 3. *Legal Proceedings*" and "Legal Matters," which primarily disclosed asbestos liability risks.

49.     The risk factor and legal disclosures were materially false and misleading when made because they omitted the fact that, as reported by *The New York Times* on July 31, 2018, "CBS's board knew – or should have known – about potential problems with Mr. Moonves's past behavior long before the news broke last week.  Rumors had proliferated almost immediately after *The New York Times* and *The New Yorker* published their prizewinning exposés of the Hollywood producer Harvey Weinstein in October."  Specifically, in the fall of 2017, a woman filed a criminal complaint with the LAPD claiming Moonves had forced her to perform oral sex on him in the 1980s, which *The New York Times* reported Moonves had "known about since November."  Moonves did not disclose this investigation to members of CBS's nomination and governance committee until January 2018, and investors did not learn about the complaint, investigation, or Moonves's knowledge thereof, until a series of articles in *The New Yorker*, *The Wall Street Journal* and *The New York Times* was published beginning in July 2018 through September 2018.  As a result, not only was the risk factor materially false and misleading, but defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus §10(b) of the 1934 Act, by failing to disclose that: (i) the Company's business operations were then facing substantial risk, as CBS was being drawn further into conflict with the #MeToo movement as a result of the ongoing investigations into prior allegations of misconduct by defendant Moonves; and (ii) having CBS drawn further into conflict with the #MeToo movement subjected it to numerous undisclosed risks, including monetary and reputational risks, particularly because Moonves was a key CBS executive and advertising was one

of CBS's largest revenue sources, and the loss of Moonves and/or any harm to CBS's reputation could adversely affect CBS's business, including its future revenue and growth prospects.

50.     On April 6, 2018, CBS filed its Proxy Statement pursuant to §14(a) of the 1934 Act with the SEC on Form DEF 14A (the "2018 Proxy").  The 2018 Proxy was signed by defendant Moonves.  The 2018 Proxy advised the market that CBS's 2018 annual general meeting of shareholders (the "2018 annual meeting") would be held in New York City on Friday, May 18, 2018. Among other things that shareholders would be asked to approve at the 2018 annual meeting, the 2018 Proxy advised that the CBS Board would seek its reelection, including defendant Moonves.[1] Concerning defendant Moonves's *bona fides* and importance to CBS as a continuing Board member, and, ostensibly, his continued service as its President, CEO and Chairman of the Board, the 2018 Proxy stated in pertinent part as follows:

> As the Company's Chairman of the Board, President and Chief Executive Officer, Mr. Moonves provides a critical link to management's perspective in Board discussions regarding the businesses and strategic direction of the Company.  With his experience in all aspects of the Company's global businesses, having served in executive positions with the Company for the past 23 years, coupled with his service on the Board for over 12 years, he provides the Board with unique institutional knowledge of the Company.

51.     Highlighting the strength of CBS's "Corporate Governance," the 2018 Proxy assured investors not only that "CBS Corporation's corporate governance practices [were] . . . established and monitored by its Board" and that the "Board, with assistance from its Nominating and Governance Committee, regularly assesse[d] CBS Corporation's governance practices in light of legal requirements and governance best practices," it also stated that, "[i]n several areas, CBS Corporation's practices [went] beyond the requirements of the NYSE corporate governance listing

---

[1]      CBS directors Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, Gordon, Griego, Klieger, Moonves, Minow, Morris, and Redstone would all seek reelection at the 2018 annual meeting, while defendant Kopelson would be replaced by incoming director nominee Richard D. Parsons.

standards."  Indeed, CBS repeatedly assured the market that it was adhering to rigorous standards of ethics in its corporate governance, expressly referencing in the 2018 Proxy its "Business Conduct Statement" and "Supplemental Code of Ethics for Senior Financial Officers."

52.     Assuring the market as to its purported rigorous compliance with the "Business Conduct Statement," including the Company's sexual harassment training protocols, the 2018 Proxy stated in pertinent part as follows:

**Business Conduct Statement**

The Company's Business Conduct Statement ("BCS") sets forth the Company's standards for ethical conduct that are expected of all directors and employees of the Company.  The BCS is available on the Company's website at www.cbscorporation.com and on the Company's intranet sites and also has been distributed to the Company's employees and directors.  As part of the Company's compliance and ethics program, directors and full-time employees are required to certify as to their compliance with the BCS and, on an ongoing basis, must disclose any potential conflicts of interest.  The Company has also implemented an online BCS training program.  The BCS addresses, among other things, topics such as:

*       *       *

•     The Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment.

53.     The 2018 Proxy also expressly assured investors that the Company was vigorously enforcing the anti-retaliation provisions of the "Business Conduct Statement" to ensure effective enforcement and that any waivers of compliance with the "Business Conduct Statement" were being disclosed to investors, stating in pertinent part as follows:

The BCS [Business Conduct Statement] provides numerous avenues for employees to report violations of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee.  These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers.  The BCS also provides that the Company will protect anyone who makes a good faith report of a violation of the BCS and that retaliation against an employee who makes a good faith report will not be tolerated.

Waivers of the BCS for the Company's executive officers or directors will be disclosed on the Company's website at www.cbscorporation.com or by Form 8-K filed with the SEC.

54.    The 2018 Proxy also assured the market of the Company's ongoing purportedly rigorous compliance with its "Supplemental Code of Ethics for Senior Financial Officers" (the "Ethics Code"). The 2018 Proxy stated in pertinent part that the Ethics Code was "applicable to the Company's Chief Executive Officer" and that it "addresse[d] . . . a general obligation to promote honest and ethical conduct within the Company."

55.    Emphasizing the purported strength of the CBS Board's then-present "Board Risk Oversight" capabilities, the 2018 Proxy assured the market that the CBS Board was enforcing rigorous reporting and oversight standards that were then in place to bring any inherent risks to the Company's reputation and operations to the Board's attention and to facilitate the Board's effective handling of them, stating in pertinent part as follows:

The Company's Board of Directors has overall responsibility for the oversight of the Company's risk management process. The Board carries out its oversight responsibility directly and through the delegation to its Committees of responsibilities related to the oversight of certain risks, as follows:

- The Audit Committee, as part of its internal audit and independent auditor oversight, is responsible for reviewing the Company's risk assessment and risk management practices and discusses risks as they relate to its review of the Company's financial statements, the evaluation of the effectiveness of internal control over financial reporting, compliance with legal and regulatory requirements, and the performance of the internal audit function, among other responsibilities set forth in the Committee's charter.

- The Compensation Committee monitors risks associated with the design and administration of the Company's compensation programs, including its performance-based compensation programs, to promote an environment which does not encourage unnecessary and excessive risk-taking by the Company's employees. The Committee also reviews risks related to management resources, including the depth of the Company's senior management. In view of this oversight and based on management's assessment, the Company does not believe that its employee compensation policies and practices create risks that

- 21 -

are reasonably likely to have a material adverse effect on the Company.

- The Nominating and Governance Committee oversees risk as it relates to monitoring developments in law and practice with respect to the Company's corporate governance processes and in reviewing related person transactions. The Committee also is responsible for the periodic review of the following risk management processes at the Company: disaster recovery, crisis management and theft of intellectual property.

Each of these Committees reports regularly to the Board on these risk-related matters, among other items within its purview. On an annual basis, the Board conducts strategy sessions, which include presentations from economic, political and industry experts, among others, on matters affecting the Company, to assist the Board and management in preparing and implementing strategic initiatives, including risk management. In addition, the Board and Committees receive regular reports from management that include matters affecting the Company's risk profile, including, among others, operations reports from the Chief Executive Officer and from division heads, all of which include strategic and operational risks; reports from the Chief Operating Officer and Chief Accounting Officer on credit and liquidity risks and on the integrity of internal controls over financial reporting; reports from the Chief Legal Officer on legal risks and material litigation; and reports on internal audit activities from the Senior Vice President, Internal Audit. The Audit Committee also receives periodic reports from the Company's Chief Compliance Officer on the Company's compliance program; Chief Information Security Officer on the Company's information security program and the management of cybersecurity risk; and Senior Vice President, Internal Audit on the Company's internal audit plan for the upcoming fiscal year, the scope of which is to determine the adequacy and function of the Company's risk management, control and governance processes. Outside of formal meetings, Board members have regular access to executives, including the Chief Executive Officer, the Chief Operating Officer, the Chief Accounting Officer, the Chief Legal Officer and the Chief Administrative Officer and Chief Human Resources Officer. The Committee and management reports, strategy sessions and real-time management access collectively provide the Board with integrated insight on the Company's management of its risks.

56.     CBS also repeatedly assured the market that, given the crucial nature of its business – being honest brokers reporting news the country could depend upon – its business was built on a foundation of reputation and trust. On the Company's website (which the 2018 Proxy directed the market to), CBS assured the market that CBS took "Social Responsibility" very seriously. The CBS website emphasized that "[r]ecognizing its influence as one of the world's leading media companies,

CBS Corporation strives to use its various platforms and reach for the public good," that the "Company is committed to producing diverse and socially responsible content across all of its divisions, as well as award-winning public service announcements and quality news coverage," and that "CBS enjoys and takes seriously its distinction of being a public trust."

57.     Meanwhile, as *The Wall Street Journal* would later disclose on September 10, 2018, "[b]y April, the rumors about a forthcoming New Yorker story detailing allegations against Mr. Moonves reached such a fever pitch that the CBS board called an emergency meeting on a Sunday to plot out what they would do if the allegations were serious enough to merit suspending him." *The Wall Street Journal* further reported that, "[w]hen CBS discovered that Moonves wasn't in fact the subject of that particular New Yorker article, the meeting was canceled."

58.     On May 4, 2018, CBS filed a quarterly report on Form 10-Q with the SEC that was certified pursuant to Sarbanes-Oxley by defendants Moonves and Ianniello, and was signed by defendants Ianniello and Liding.  Like the 3Q17 10-Q, this Form 10-Q also did not identify any specific risk factors, other than to state the following:

> These risks, uncertainties and other factors include, among others: . . . other factors described in the Company's filings made under the securities laws, including, among others, those set forth under "Item 1A. Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017 and in our Quarterly Reports on Form 10-Q, and in the Company's recent Current Reports on Form 8-K.  There may be additional risks, uncertainties and factors that the Company does not currently view as material or that are not necessarily known.

59.     That risk factor was materially false and misleading when made because it omitted the fact that, as *The New York Times* reported on July 31, 2018, "CBS's board knew – or should have known – about potential problems with Mr. Moonves's past behavior long before the news broke last week.  Rumors had proliferated almost immediately after *The New York Times* and *The New Yorker* published their prizewinning exposés of the Hollywood producer Harvey Weinstein in October."  Specifically, in the fall of 2017, a woman filed a criminal complaint with the LAPD claiming

- 23 -

Moonves had forced her to perform oral sex on him in the 1980s, which *The New York Times* reported Moonves had "known about since November." Moonves did not disclose this investigation to members of CBS's nomination and governance committee until January 2018, and investors did not learn about the complaint, investigation, or Moonves's knowledge thereof, until a series of articles in *The New Yorker*, *The Wall Street Journal* and *The New York Times* was published beginning in July 2018 through September 2018. Furthermore, as *The Wall Street Journal* reported on September 10, 2018:

> By April, the rumors about a forthcoming New Yorker story detailing allegations against Mr. Moonves reached such a fever pitch that the CBS board called an emergency meeting on a Sunday to plot out what they would do if the allegations were serious enough to merit suspending him, the people said. When CBS discovered that Mr. Moonves wasn't in fact the subject of that particular New Yorker article, the meeting was cancelled.

As a result, not only was the risk factor materially false and misleading, but defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus §10(b) of the 1934 Act, by failing to disclose that: (i) the Company's business operations were then facing substantial risk, as CBS was being drawn further into conflict with the #MeToo movement as a result of the ongoing investigations into prior allegations of misconduct by defendant Moonves; and (ii) having CBS drawn further into conflict with the #MeToo movement subjected it to numerous undisclosed risks, including monetary and reputational risks, particularly because Moonves was a key CBS executive and advertising was one of CBS's largest revenue sources, and the loss of Moonves and/or any harm to CBS's reputation could adversely affect CBS's business, including its future revenue and growth prospects.

60.     Following highly publicized CBS Board hostilities between the Redstone and Moonves camps over the potential recombination of CBS and Viacom, and the initiation of litigation in the Delaware Chancery Court on May 17, 2018, CBS announced it was postponing the previously

scheduled 2018 annual meeting – where, among other things, defendant Moonves would stand for reelection – until August 10, 2018.

61.     On July 19, 2018, *The Hollywood Reporter* published an interview with defendant Rhodes, CBS News' President, during which he discussed Charlie Rose's firing and the impact the #MeToo movement was then having on the news media industry in general and on CBS in particular.  According to *The Hollywood Reporter*, defendant Rhodes stated that the "revelations" that resulted in "Charlie Rose's November exit from *CBS This Morning* after allegations of misconduct" had "forced CBS News to confront a widespread retrograde culture where misconduct was whispered about for years but tolerated."  According to Rhodes, "[i]n the wake of Rose's departure, CBS News instituted mandatory in-person harassment training for its approximately 1,200 permanent employees and affirmed a focus on pay parity, which began before the current wave of misconduct disclosures."  In reality though, as Farrow would disclose in his soon-to-be-published exposé citing named sources, many CBS senior executives were simply asking their staff "to complete the company's mandatory online sexual-harassment training programs for them."

62.     In discussing the impact the #MeToo movement, and Charlie Rose's termination in particular, had had on CBS's culture with regard to sexual harassment, defendant Rhodes assured the market that CBS had mitigated any known risks of sexual harassment damaging its reputation and standing, stating in pertinent part that a "really important part of getting #MeToo right is having the right people in the room making decisions," and that one thing he was "really proud of [was having] gotten to a place where the management team is at least half female and about a third diverse," stating "you really need those gender and diversity perspectives when you're making decisions," "[o]therwise you're more prone to make bad ones."

63.    During *The Hollywood Reporter* interview, defendant Rhodes also credited defendant Moonves with having actually strengthened CBS's oversight of sexual harassment misconduct, including personally overseeing Charlie Rose's termination, and refuted the notion that Moonves's positions were in jeopardy.  When the interviewer asked: "Your boss, Leslie Moonves, is in a very public skirmish with Shari Redstone, the major shareholder of CBS Corp," leading "[m]any [to] speculate[] that if he loses this battle, he'll have no choice but to leave the network.  So what is CBS without Les?," defendant Rhodes responded, in pertinent part, that CBS "couldn't have done any of the things you see us doing without not just his support but also his engagement.  And that includes the talent, where he always has not just an opinion but an important role in working through these decisions with management," adding that Moonves was "really good" at managing the oversight of sexual harassment claims.

64.    The true facts, which were then known to or recklessly disregarded by the defendants and were concealed from the investing public during the Class Period, were:

(a)    that CBS's business operations were facing substantial risk, as CBS was being drawn further into conflict with the #MeToo movement as a result of the ongoing media investigations into prior allegations of misconduct by defendant Moonves;

(b)    that having CBS drawn further into conflict with the #MeToo movement subjected it to numerous undisclosed risks, including monetary and reputational risks, particularly because advertising is one of CBS's largest revenue sources and any harm to its reputation and/or standing in the business community would adversely affect its current business, as well as its future revenues and growth prospects; and

(c)    as a result of the foregoing, the Company was not on track to achieve the financial results CBS claimed to be on track to achieve during the Class Period.

- 26 -

65.     On July 27, 2018, media outlets began reporting that *The New Yorker* would shortly publish an article describing a pattern of sexual harassment alleged by six women against defendant Moonves.  The article would also outline allegations of sexual harassment against several CBS News executives, including Jeffrey Fager, the long-time head of *60 Minutes*.  On this news, CBS's stock price fell over 6% on unusually heavy volume.

66.     Later that day, the CBS Board announced that it would investigate the allegations of misconduct, stating the claims would be "taken seriously" and that "[u]pon the conclusion of that investigation, which involve[d] recently reported allegations that go back several decades, the board [would] promptly review the findings and take appropriate action."  Nonetheless, the price of CBS common stock declined significantly on July 27, 2018, on unusually high trading volume.

## POST-CLASS PERIOD EVENTS

67.     On Sunday July 29, 2018, *The New York Times* reported that the CBS Board had subsequently "spent most of the weekend discussing what immediate actions it should take involving Les Moonves, the company's chief executive, after a published report that included allegations of sexual misconduct from  six women."  Critically, the article disclosed that "[a]t least two of the board's 14 members ha[d] questioned whether Mr. Moonves should continue to run the company during an internal investigation," citing "two people familiar with the conversations who asked not to be named because the matter was confidential."  On this news, the price of CBS common stock declined further, on unusually high trading volume.

68.     On the evening of July 30, 2018, CBS filed a report on Form 8-K with the SEC disclosing that the CBS Board had again decided to postpone the 2018 annual meeting.

69.     On August 6, 2018, *The New Yorker* published the online exposé by Farrow detailing allegations of years of sexual assault against defendant Moonves by his co-workers at CBS and describing how, under his leadership, CBS had facilitated the sexual harassment of scores more

women, including company-sanctioned retaliation against victims who spoke up.  *See* Exhibit A

hereto.  In the exposé, Farrow stated that "[s]ix women who had professional dealings with

[Moonves] told me that, between the nineteen-eighties and the late aughts, Moonves sexually

harassed them," with "[f]our describ[ing] forcible touching or kissing during business meetings, in

what they said appeared to be a practiced routine," and "[t]wo [telling] me that Moonves physically

intimidated them or threatened to derail their careers."  According to the exposé, "[a]ll [of the

women] said that he became cold or hostile after they rejected his advances, and that they believed

their careers suffered as a result."  The exposé detailed the ongoing impact at CBS of defendant

Moonves's and the CBS Board's concealment of the misconduct through private settlements and

non-disclosure agreements, stating, in pertinent part, as follows:

> Thirty current and former employees of CBS told me that such behavior extended from Moonves to important parts of the corporation, including CBS News and "60 Minutes," one of the network's most esteemed programs.  During Moonves's tenure, men at CBS News who were accused of sexual misconduct were promoted, even as the company paid settlements to women with complaints. It isn't clear whether Moonves himself knew of the allegations, but he has a reputation for being closely involved in management decisions across the network.  Some of the allegations, such as those against the former anchor Charlie Rose, as reported by the Washington *Post*, have already become public.  Other claims are being reported here for the first time.  Nineteen current and former employees told me that Jeff Fager, the former chairman of CBS News and the current executive producer of "60 Minutes," allowed harassment in the division.  "It's top down, this culture of older men who have all this power and you are nothing," one veteran producer told me.  "The company is shielding lots of bad behavior."

70.    On September 9, 2018, *The New Yorker* published a second exposé outlining in

harrowing detail additional allegations of sexual harassment and assault against defendant Moonves

and further describing CBS's widespread culture of sexual harassment.  *See* Exhibit B hereto.  The

article stated, in part, as follows:

> Six additional women are now accusing Moonves of sexual harassment or assault in incidents that took place between the nineteen-eighties and the early two-thousands. They include claims that Moonves forced them to perform oral sex on him, that he exposed himself to them without their consent, and that he used physical violence

and intimidation against them.  A number of the women also said that Moonves retaliated after they rebuffed him, damaging their careers. Similar frustrations about perceived inaction have prompted another woman to raise a claim of misconduct against Jeff Fager, the executive producer of "60 Minutes," who previously reported to Moonves as the chairman of CBS News.

One of the women with allegations against Moonves, a veteran television executive named Phyllis Golden-Gottlieb, told me that she filed a criminal complaint late last year with the Los Angeles Police Department, accusing Moonves of physically restraining her and forcing her to perform oral sex on him, and of exposing himself to her and violently throwing her against a wall in later incidents. The two worked together in the late nineteen-eighties.  Law-enforcement sources told me that they found Golden-Gottlieb's allegations credible and consistent but prosecutors declined to pursue charges because the statutes of limitations for the crimes had expired.  Early this year, Moonves informed a portion of the CBS board about the criminal investigation.

\*       \*       \*

In a new allegation against Fager, Sarah Johansen, a producer who was an intern at CBS in the late nights, said that he groped her at a work party.  Johansen told me that she felt compelled to speak because she simply "can't believe he's back there."  Johansen told me that, when she was growing up, outside a small town in Denmark, "I had really idolized '60 Minutes' since I was young.  I can't possibly overstate how much it meant to me, even just to be an intern."  She said that, upon arriving at the program, she was thrilled by the work but troubled by the culture. Like several others, she used the term "boy's club" to describe the atmosphere.  "I really felt like this was one of the most sexist places I've ever worked," she said.

71.     Within hours of the story's publication, CBS announced that defendant Moonves would be leaving the Company.

72.     According to a September 10, 2018 *Wall Street Journal* report, "[o]n Aug. 15, [defendant] Moonves was accidentally copied on an email to the entire CBS board detailing damaging findings in the law firms' investigations and discussing how to proceed should he need to be put on leave, according to people familiar with the matter."

73.     Two days later, on September 12, 2018, CBS disclosed that Jeff Fager, the executive producer of *60 Minutes* and one of the most powerful figures in television news, was leaving CBS. According to *The Wall Street Journal*, his termination was precipitated by his threatening another

journalist to cease reporting about his misconduct: "Fager sent a text message to CBS News Correspondent Jericka Duncan, who has been covering the various scandals that have engulfed the company and its news division, warning her to tread carefully in her coverage in a way that was interpreted as threatening, according to people familiar with the matter."

74.     Later that day, *The New York Times* published a story, entitled "Threats and Deception: Why CBS's Board Turned Against Leslie Moonves," in which it revealed that defendant Moonves knew but had concealed that the LAPD had begun investigating him for sexual assault in November 2017, at the same time Moonves began pledging solidarity with the #MeToo movement. Rather than disclose the allegations and subsequent investigation – as well as the risk that the allegations would impair his ability to continue as CEO – defendant Moonves, in exchange for continued silence, had attempted to find a job at the Company for one of his accusers who was threatening to go public.  The article also revealed, based on interviews with directors and other people familiar with the Board's deliberations, that various CBS insiders were well aware of the allegations against defendant Moonves well before the initial July 27, 2018 disclosure:

> Mr. Moonves's eventual unraveling started in January [2018], when Ms. [Shari] Redstone [the president and director of CBS's controlling shareholder NAI] repeatedly told two independent directors, Bruce Gordon and Martha Minow . . . that she had heard that journalists – including *The New Yorker*'s Ronan Farrow – were working on stories about sexual harassment allegations against him.  Mr. Gordon, the former head of the National Association for the Advancement of Colored People, and Ms. Minow enlisted Michael J. Aiello, a partner at Weil, Gotshal & Manges, to look into the matter.  Mr. Aiello questioned Mr. Moonves by phone in late January, with other Weil Gotshal lawyers listening to the call.

> *                *                *

> On Aug. 2, the *Los Angeles Times* reported that an unnamed woman, later identified by *The New Yorker* as Phyllis Golden-Gottlieb, had filed a complaint against Mr. Moonves with the Los Angeles police in late 2017, just weeks before Mr. Aiello had questioned Mr. Moonves on the board's behalf . . . .  Mr. Moonves was aware of that complaint at the time of Mr. Aiello's interview, but it wasn't mentioned in his report to Mr. Gordon and Ms. Minow.

- 30 -

\*       \*       \*

Pressed by directors for an explanation after the *Los Angeles Times* story, Mr. Moonves insisted he'd told Mr. Aiello about the matter in January.  And in any event, he argued that the incident was so old that he viewed it as a "personal matter" that had no bearing on his tenure at CBS.

75.     On September 28, 2018, CBS disclosed that it had "received subpoenas from the New York County District Attorney's Office and the New York City Commission on Human Rights" regarding "the allegations in recent press reports about CBS's former Chairman and Chief Executive Officer, CBS News and cultural issues at all levels of CBS," and that the "New York State Attorney General's Office ha[d] also requested information about these matters."

## LOSS CAUSATION

76.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of CBS common stock and operated as a fraud or deceit on Class Period purchasers of CBS common stock by misrepresenting the Company's business, operations and prospects.  Later, as the falsity of defendants' statements began to be revealed to investors, the price of CBS common stock fell as the artificial inflation dissipated.  As a result of their purchases of CBS common stock during the Class Period, plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

77.     The market for CBS common stock was open, well developed and efficient at all relevant times, with average daily trading volume of more 3 million shares during the Class Period. As a result of the materially misleading statements and failure to disclose the true state of the Company's business, operations and prospects, CBS common stock traded at artificially inflated prices.  Plaintiff and other Class members purchased CBS common stock relying upon the integrity of the market for CBS common stock and suffered economic loss as a result thereof.

78.     Defendants' false or misleading statements had the intended effect and caused CBS common stock to trade at artificially inflated levels.

79.     The declines in the price of CBS common stock at the end of the Class Period were the direct result of the nature and extent of defendants' prior false statements and material omissions being revealed to and/or leaking into the market.  The timing and magnitude of the price declines in CBS common stock negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

80.     The economic loss plaintiff and other members of the Class suffered was caused by defendants' fraudulent scheme to artificially inflate the price of CBS common stock and maintain that price at artificially inflated levels, as was revealed by the subsequent and significant declines in the value of CBS stock when defendants' earlier misrepresentations and omissions became publicly available.

## PRESUMPTION OF RELIANCE

81.     Plaintiff and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for CBS common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     CBS stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     CBS stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

(c)     CBS was qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, for well-established and largely capitalized issuers for whom less scrutiny is required;

(d)     As a regulated issuer, CBS filed periodic public reports with the SEC and NYSE;

(e)     CBS regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     CBS was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace; and

(g)     Unexpected material news about CBS was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

82.     As a result of the foregoing, the market for CBS common stock promptly incorporated current information regarding CBS from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all those who transacted in CBS common stock during the Class Period suffered similar injury through their transactions in CBS stock at artificially inflated prices and a presumption of reliance applies.

83.     Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## CLASS ACTION ALLEGATIONS

84.     This is a class action on behalf of all purchasers of CBS Class A and Class B common stock during the Class Period, who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the Company's officers and directors at all

relevant times, as well as their immediate families, defendants' legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

85.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  CBS common stock was actively traded on the NYSE.  Record owners and other members of the Class may be identified from records maintained by CBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to plaintiff at this time, CBS reported that over and 37.5 million shares of Class A common stock and 338.5 million shares of Class B common stock were outstanding as of August 2, 2018.  Accordingly, plaintiff reasonably believes there are thousands of members in the proposed Class.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

88.     Common legal and factual questions exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CBS;

(c)     whether the price of CBS common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

89.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

90.     Plaintiff incorporates ¶¶1-89 by reference.

91.     Defendants are liable for making false statements and failing to disclose adverse facts known to them about CBS.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CBS common stock was a success, as it: (i) deceived the investing public regarding CBS's business, operations and prospects; (ii) artificially inflated the price of CBS common stock; and (iii) caused plaintiff and other members of the Class to purchase CBS common stock at inflated prices.

92.     During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 35 -

93.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CBS common stock during the Class Period.

94.     Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about CBS's business, operations and prospects as specified herein.

95.     The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing adverse information regarding CBS's business, operations and prospects from the investing public and supporting the artificially inflated price of its common stock.

96.     As a result of defendants' dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of CBS common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's stock traded, and/or on the absence of material adverse information that was known to or recklessly

disregarded by defendants, but not disclosed in defendants' public statements during the Class Period, plaintiff and the other Class members acquired CBS common stock during the Class Period at artificially high prices and were ultimately damaged thereby.

97.    At the time of said misrepresentations and omissions, plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had plaintiff and other Class members and the marketplace known the truth regarding the problems that CBS was experiencing, which defendants did not disclose, plaintiff and other Class members would not have purchased their CBS common stock, or, if they had purchased CBS stock during the Class Period, would not have done so at the artificially inflated prices they paid.

98.    In addition to the duties of full disclosure imposed on CBS and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to CBS's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC so that the market price of the Company's common stock would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

99.    By reason of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5.

100.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other Class members suffered damages in connection with their Class Period purchases of CBS common stock.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

101.     Plaintiff incorporates ¶¶1-100 by reference.

102.     The Individual Defendants and CBS acted as controlling persons of CBS within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of CBS stock, the Individual Defendants had the power and authority to cause CBS to engage in the wrongful conduct complained of herein.  CBS controlled the Individual Defendants and all of its employees.

103.     By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining and certifying that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative and plaintiff's counsel as Lead Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the Class against defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.     Awarding plaintiff and the Class their reasonable attorneys' fees, costs, and expenses incurred in this action; and

D.     Such equitable/injunctive or other relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 1, 2018                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           SAMUEL H. RUDMAN
                                           MARY K. BLASY


                                           */s/ Samuel H. Rudman*
                                           SAMUEL H. RUDMAN

                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)
                                           srudman@rgrdlaw.com
                                           mblasy@rgrdlaw.com

                                           JOHNSON FISTEL, LLP
                                           MICHAEL I. FISTEL, JR.
                                           40 Powder Springs Street
                                           Marietta, GA  30064
                                           Telephone:  770/200-3104
                                           770/200-3101 (fax)
                                           michaelf@johnsonfistel.com

                                           Attorneys for Plaintiff

- 39 -

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, John Lantz, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 7/27/18 | 75 | 57.53 |
| 7/27/18 | 25 | 53.91 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| N/A | | |
| N/A | | |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

DocuSign Envelope ID: 05B2C728-5405-49CD-9027-C6DBAF99635D

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of September, 2018.

DocuSigned by:

_____

C07772CB187342B...

John Lantz